591 S.E.2d 623

**In the Matter of Stephen M. PSTRAK, Respondent.**

No. 25767.

Supreme Court of South Carolina.

Submitted Dec. 8, 2003.
Decided Jan. 12, 2004.

See also *In the Matter of McMillian,* 350 S.C. 216, 565 S.E.2d 765 (2002).

Henry B. Richardson, Jr., of Columbia, for Office of Disciplinary Counsel.

Stephen M. Pstrak, of Lexington, Pro Se.

2

**PER CURIAM:**

Respondent and Disciplinary Counsel have entered into an agreement pursuant to Rule 21, RLDE, Rule 413, SCACR, in which respondent admits misconduct and agrees to accept an admonition or a public reprimand. We accept the agreement and issue a public reprimand.[1] The facts, as set forth in the agreement, are as follows.

## Facts

### I. Real Estate Closing Matter I

Respondent attended a real estate closing in place of attorney J. Wendell Arsi, who had a conflict and could not attend.[2] The closing involved the purchase of a mobile home from a mobile home dealer and real property from a developer. The transaction was being financed by a lender. Respondent was only asked to attend the closing and be responsible for the review and execution of the closing documents. Respondent was "under the good faith impression" that Arsi had examined, or would be examining, or at least reviewing, the abstract of title and had drafted, or at least reviewed, the closing documents.

Respondent attended the closing at the offices of Carolina Title Services, Inc. (CTS). The HUD–1 Settlement Statement reflected that attorney William J. McMillian, III, was the settlement agent. Respondent gathered from that information that the proceeds from the transaction would be disbursed by McMillian in accordance with the Settlement Statement. It was unclear to respondent whether Arsi or McMillian was to be responsible for updating the title and seeing to the recordation of documents in connection with this transaction, but respondent incorrectly assumed that one of those attorneys would do so.

Respondent is now advised, and does not dispute, that the loan documents were prepared by CTS, that Amy Cook, the

---

1. In January 2003, respondent received an eight month suspension for misconduct unrelated to that set forth in this opinion. *In the Matter of Pstrak*, 352 S.C. 505, 575 S.E.2d 559 (2003).

2. Respondent discussed the matter with Arsi's paralegal, but did not speak directly with Arsi.

owner and manager of CTS, advised Arsi that the funds from this transaction would be disbursed by McMillian, and that Arsi was under the impression that he was only expected to attend the closing and that other aspects of the transaction required by applicable rules to be handled by an attorney would be handled by McMillian.[3] Respondent did not confirm any of the foregoing with Arsi or McMillian and respondent is advised, and does not dispute, that Arsi did not confirm any of the foregoing with McMillian. It is now known and acknowledged that McMillian had no involvement with the transaction whatsoever, that McMillian had previously opened an IOLTA account with BB & T on which he allowed Cook to be a signatory, that the checkbooks for that IOLTA account were kept by Cook at CTS, that the cancelled checks and bank statements concerning real estate transactions were returned to and maintained by Cook, that McMillian was not reconciling or even reviewing the bank statements and cancelled checks pursuant to Rule 417, SCACR, and that McMillian's only involvement with transactions such as the instant transaction was to allow CTS to use his IOLTA account and show McMillian as settlement agent.

Subsequently, there was a substantial shortage discovered in McMillian's IOLTA account. It is reported that BB & T placed a "sweep" on the account at the direction of Cook and would "sweep" the funds from the account into Cook's account on a daily basis. After the shortage of funds in McMillian's IOLTA account was discovered, McMillian was placed on interim suspension. *In the Matter of McMillian*, 350 S.C. 216, 565 S.E.2d 765 (2002).

The closing appeared to be a relatively simple matter. Respondent had no file in connection with the transaction when he arrived for the closing. Respondent questioned Cook about getting a file to Arsi. Respondent later checked with Arsi's office, which confirmed that it had received a file in connection with the closing, which, in turn, "triggered" the firm to compensate respondent for standing in for Arsi at the closing. At the time, respondent was under the impression

---

3. By separate opinion of this same date, Arsi has been disbarred due, in part, to his participation in this closing arrangement with CTS and McMillian.

that his involvement in the transaction ended upon the review and execution of the closing documents and the file being sent to Arsi.

As a result of delays and the subsequent suspension of McMillian, the transaction was not completed. The mobile home dealer received payment for the mobile home, but the developer did not receive payment for the real estate. Respondent subsequently received a telephone call from an attorney representing the developer advising that the transaction had not been completed. Respondent left a message on the attorney's answering machine relating his limited involvement in the transaction and advising her to contact Arsi.

When the purchaser became aware that the transaction had not been completed in a timely manner, he filed a complaint with the Commission on Lawyer Conduct. He maintained he had expended funds to clear the real property and to have the driveway installed, but was not able to register his mobile home or get connections for water or electricity or a permit for a septic tank because the transaction had not been completed. The purchaser was under the impression that respondent was standing in for McMillian at the closing and was unaware of Arsi having any involvement in the matter.

Respondent now recognizes that, pursuant to *State v. Buyers Service Co., Inc.*, 292 S.C. 426, 357 S.E.2d 15 (1987) and *Doe v. Condon*, 351 S.C. 158, 568 S.E.2d 356 (2002), Cook was engaged in the unauthorized practice of law and that respondent, albeit unintentionally, assisted Cook in doing so. Respondent now acknowledges that when he served as the closing attorney in connection with the transaction it was his responsibility to see that an attorney had been involved in all other aspects of the transaction requiring attorney participation under the aforementioned cases, that it was his responsibility to either see to the proper disbursement of the funds or see that an attorney approved by the client was going to handle or oversee the recordation of documents and proper disbursement of the funds.

In mitigation, Disciplinary Counsel states respondent was under the good-faith impression that either Arsi or McMillian were to see to the other aspects of the closing that required attorney participation, that respondent was unaware that

Cook was engaging in the unauthorized practice of law, that respondent was unaware Cook had unsupervised access to and use of McMillian's IOLTA account and that respondent in no way contributed to the subsequent defalcations in the transaction. Furthermore, Disciplinary Counsel has been advised by the attorney subsequently retained by the developer that the matters set forth herein were resolved to the satisfaction of the purchaser within a few months after the closing.

## II. Real Estate Closing Matter II

Respondent was contacted by a paralegal in Arsi's office to attend a second closing in Arsi's place. The paralegal asked only that respondent attend the closing and perform as closing attorney at the closing. Respondent attended the closing, reviewed the closing documents with the clients and supervised the execution of the closing documents. Respondent did not undertake any further work on the transaction after attending the closing and, instead, left the executed documents and the proceeds from the transaction in the hands of Cook or another employee of CTS.

Respondent was under the impression that either Arsi or McMillian had conducted the title examination or reviewed a title abstract in connection with the property, had prepared and reviewed the closing documents, and would see to the finalization of the transaction, including updating the title prior to recordation, recordation of the necessary documents in the public records, and disbursement of the proceeds in accordance with the HUD–1 Settlement Statement presented and executed at closing.[4]

It was respondent's understanding, from his conversation with Arsi's paralegal, that his sole function at the closing was to review the closing documents, see to the proper execution of the documents, and answer any questions that the clients might have concerning the closing documents and the closing. Respondent did not advise the clients of the limited scope of his representation.

Due to McMillian being placed on interim suspension and his IOLTA account being frozen, the transaction could not be

---

4. The settlement statement showed McMillian as the settlement agent.

closed. The clients called respondent's office to discuss the impediments to closing the transaction. Respondent instructed his secretary to tell the clients that respondent's involvement was limited to attending the closing and they should contact Arsi about the problems they were having getting the transaction closed. Respondent tried to contact the clients directly on two occasions, but was unable to reach them. He left a message on their answering machine to contact Arsi since respondent was only at the closing to assist Arsi and that he understood Arsi to be the actual closing attorney. The clients were able to remove the impediments to the transaction a year later after hiring counsel to assist them.

Arsi reported that had he been able to attend the closing, his participation would have been limited to the same participation respondent had in the transaction, that no lawyer examined the title to the real property which was the subject of the transaction or reviewed any title abstract, that no lawyer prepared the closing documents, that no lawyer saw to the recordation of documents in the public records or to the completion of the transaction in accordance with the wishes of the clients and the instructions from the lender, and that, had the transaction been closed, the disposition of the proceeds of the transaction would not have been made by a licensed attorney but would have been made by CTS using McMillian's IOLTA account.

Respondent now recognizes that, by his limited participation in the closing, he assisted Cook in the unauthorized practice of law, albeit unwittingly. Respondent further acknowledges that it was his professional responsibility upon serving as closing attorney, to ensure that the other aspects of the closing required to be handled by an attorney were handled or properly supervised by a person licensed to practice law in South Carolina.

## III. Mitigation

Disciplinary Counsel reports that respondent has been fully cooperative in the conclusion of this matter, has been forthright in acknowledging his misconduct and addressing the matter, and had no involvement whatsoever in, or knowledge of, the subsequent shortages in McMillian's IOLTA account

until after his participation in the two closings. Respondent now recognizes that he should have been more diligent in insuring that an attorney was acting at each stage of the transactions, for which he became responsible upon serving as the closing attorney, and that client funds from the transactions should not have been left in the hands of a non-lawyer. Finally, it appears that respondent's relationship with CTS was short lived and only involved two transactions.

## *Law*

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 5.3(b) (a lawyer having direct supervisory authority over a nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer); Rule 5.5(b) (a lawyer shall not assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law); and Rule 8.4(a) (it is professional misconduct for a lawyer to violate the Rules of Professional Conduct). We also find he has violated the following provisions of the Rules of Professional Conduct: Rule 1.1 (a lawyer shall provide competent representation to a client); Rule 1.2(a) (a lawyer shall abide by a client's decisions concerning the objectives of representation, except in limited circumstances, and shall consult with the client as to the means by which they are to be pursued); and Rule 1.2(c) (a lawyer may limit the objectives of the representation if the client consents after consultation).

Respondent's misconduct constitutes grounds for discipline under Rule 7(a)(1) of the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR (it shall be a ground for discipline for a lawyer to violate the Rules of Professional Conduct).

## *Conclusion*

We find that respondent's misconduct warrants a public reprimand. Accordingly, we accept the Agreement for Disci-

pline by Consent and publicly reprimand respondent for his actions.

PUBLIC REPRIMAND.

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.